**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 21-21284-CIV-SCOLA/GOODMAN**
**(CASE NO. 11-20279-CR-SCOLA)**

ISAAC FELDMAN,

     Petitioner,

v.

UNITED STATES OF AMERICA,

     Respondent.

_____/

**REPORT AND RECOMMENDATIONS**
**<u>RECOMMENDING DENIAL OF SECTION 2255 MOTION</u>**

Movant Isaac Feldman filed a motion to vacate his convictions and sentences for conspiracy to commit wire fraud and conspiracy to commit money laundering. [ECF Nos. 1; 6]. Feldman offers myriad reasons to vacate his convictions, all based on allegations his trial counsel was constitutionally ineffective: (1) his trial counsel provided incorrect legal advice, impacting Feldman's decision on whether to testify; (2) his trial counsel accepted a prejudicial and legally incorrect jury instruction; (3) his trial counsel failed to object to an anti-Semitic literary comparison of Feldman to Charles Dickens' *Oliver Twist* character, Fagin; and (4) his trial counsel affirmatively introduced prejudicial evidence associating Feldman with the Russian Mafia and Donald Trump. [ECF No. 6].

United States District Judge Robert N. Scola referred the § 2255 motion to the Undersigned. [ECF No. 3].

The Government filed an opposition response to Feldman's habeas petition [ECF No. 7] and Feldman filed a reply [ECF No. 8].

On October 5, 2021, the Undersigned held a 2.5-hour evidentiary hearing on the first, third, and fourth issue raised by Feldman. [ECF Nos. 11; 13]. At the hearing, Feldman's trial counsel, Richard Houlihan, was the only witness to testify. [ECF No. 18].

Following the hearing, the Undersigned provided Feldman with the opportunity to file a notice of authorities on the following topic: "Is a Defendant able to prevail on a claim that he did not testify due to his attorney's misadvice when the presiding judge engaged in a thorough colloquy with the Defendant and the Defendant stated under oath that he made the decision not to testify on his own accord?" [ECF No. 14]. Feldman was also permitted, but not required, to file a post-hearing memorandum of law. *Id*. If Feldman availed himself of either of these opportunities, then the Government was allowed, but not required, to submit a responsive pleading. *Id.*

Feldman filed a Notice of Authorities [ECF No. 15] and elected to not file a post-hearing memorandum [ECF No. 17]. The Government also filed its own Notice of Authorities. [ECF No. 16].

For the reasons discussed below, the Undersigned **respectfully recommends** that the District Court **deny** Feldman's habeas motion.

## I.      Factual and Procedural Background

On April 14, 2011, Feldman and fourteen others were indicted on conspiracy, fraud, and money laundering charges stemming from the illegal practices of a series of Miami Beach nightclubs with which Feldman and his co-defendants were associated. [CRDE No. 102]. [1] Feldman, along with several of his co-defendants, had a forty-one-day trial in late 2012. [CRDE No. 951]. The jury found Feldman guilty of one count of conspiracy to commit wire fraud and one count of conspiracy to commit money laundering. [CRDE No. 957]. Feldman, along with his co-defendants, prevailed on appeal, and his conviction and sentence were reversed. *See United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016). The case was remanded for a new trial. *Id.*

Feldman proceeded to trial again, this time represented by Richard Houlihan.[2] [CRDE No. 1419]. With Feldman as the only defendant on trial, the second trial lasted only nine days. [CRDE No. 1445]. Feldman was again found guilty of the same charges. [CRDE No. 1443]. The Eleventh Circuit affirmed Feldman's convictions on appeal. *United States v. Feldman*, 931 F.3d 1245 (11th Cir. 2019).

---

[1]      References to the docket in the underlying criminal case will be to "CRDE" and references to the instant civil § 2255 habeas case will be to "ECF."

[2]      In the first trial, Feldman was represented by Myles Malman. [CRDE No. 130; 1111]. Feldman was found indigent for the retrial and Richard Houlihan was appointed by the court as his counsel. [CRDE No. 1352].

a. <u>First Trial</u>[3]

Under the Government's theory of the case, Feldman and his co-defendants were participants/investors in multiple night clubs, which were designed to deceive tourists and other individuals into entering the nightclub so that the club could make unauthorized charges on the customers' credit cards, victimizing them and the credit card companies.

The night clubs would accomplish this task through the use of female "promoters" from Eastern Europe ("Bar Girls" or "B-girls"), who would pose as tourists or non-affiliated club goers to lure tourists and patrons of legitimate restaurants into the night club. Once inside the night club, the B-girls would use a number of tactics to increase the victims' credit card bills, including, but not limited to: encouraging the victims into excessively drinking in order to lower or eliminate their faculties; misleading the victims about the price of alcohol; ordering additional bottles of alcohol without the victims' knowledge or consent; and pouring the alcohol out of bottles so that the victims would order more.

The other employees of the nightclubs would make copies of the victims' credit cards and driver's licenses to diminish the chances of successful chargebacks. Once the

---

[3]     Unless otherwise cited, the general factual background is derived from a combination of: (1) the Eleventh Circuit's appellate decision, *Takhalov*, 827 F.3d 1307; (2) the Government's Omnibus Opposition to Defendants' Motions for Judgment of Acquittal [CRDE No. 1022]; the trial transcripts [CRDE Nos. 1120-60]; and the parties' pleadings [ECF Nos. 6-8].

defendants obtained these fraudulent proceeds, they would launder the money through bank accounts and cash. The defendants' end goal was to divide the remaining illicit proceeds amongst themselves.

Feldman was specifically accused of being involved with the fraudulent activity at two night clubs: VIP and Stars Lounge. The evidence against Feldman primarily consisted of testimony from cooperating witnesses, victims, undercover officers, and other law enforcement; airline tickets purchased by Feldman for B-girls; the clubs' financial documents located in Feldman's real estate business; photographs; Feldman's investments in the clubs; and video and audio recordings of purportedly incriminating statements made by Feldman.

### i.   Feldman's Testimony

Feldman testified  in this first trial. [CRDE Nos. 1149-50]. Feldman proclaimed his innocence of all charges to the jury. [CREDE No. 1149]. He claimed he was on trial "because of [his] stupidity to trust people and because [he] was a minor investor in [the Stars Lounge] that [he] didn't know nothing about, the business that [he] didn't know nothing about." *Id.* at p. 47. When questioned about Club Dolce, Caviar Bar, Nowhere Bar, Club Moreno, and Steel Toast (other night clubs in which these same activities occurred), Feldman claimed to have learned about those places only after he was arrested. *Id.* at pp. 47-48.

Feldman was very involved with growing the community of Sunny Isles that he

lived in. *Id.* at pp. 65-67; 72. Feldman denied assisting Oleg Simchuk[4] with recruiting women for the Stars Lounge or VIP Club ("VIP"). *Id.* at pp. 69-70. Feldman said it wasn't his job to hire promoters to work at either Stars Lounge or VIP. *Id.* at p. 71. Feldman claimed it was his intent to invest as a "silent partner" or "minority partner" and that he did not have time to be at the nightclubs. *Id.* at p. 80.

Feldman also claimed his involvement in VIP was legitimate and it was his intent to look for other businesses to bring in income, leading him to invest in his friend Maxim Ruchkin's[5] proposed "bottle club." *Id.* at pp. 81-84; 97. According to Feldman, he was going to only invest and Ruchkin would manage the club. *Id.* at p. 83. Feldman was initially unaware of how the bottle club business operated so he went to New York to research the "bottle club scene." *Id.* at pp. 85-86.

While there, Feldman obtained a night club menu so that he could learn the proper pricing at bottle clubs. *Id.* at p. 88. Based on that menu, and Feldman's conversation with

---

[4]     Oleg Simchuk, sometimes identified as "Alec Simchuk", was a cooperating witness against Feldman and Feldman's co-defendants. [CRDE No. 844]. Simchuk testified during the Government's case and explained that Feldman had an intimate understanding of how the nightclubs operated and that Feldman was aware of, encouraged, and participated in, the fraudulent activity. *Id.* at pp. 102, 107-08, 111-13, 117, 129.

[5]     Maxim Ruchkin was a friend of Feldman's with whom Feldman entered into an agreement to operate a nightclub scheme similar to the one employed by Simchuk. [CRDE No. 1125, pp. 118-20]. The Ruchkin-Feldman partnership was not generating money, which is why Feldman approached Simchuk and became involved with Simchuk's clubs. *Id.* at 118-20.

the New York club manager, Feldman learned that some bottle clubs would charge $35,000 for a bottle of champagne. *Id.* at p. 91. He also learned about how these clubs employed promoters who would receive a percentage of the amount of money spent by patrons they directed to the club. *Id.* at pp. 93-94. Feldman did not find this to be a strange business model. *Id.* After this trip, Feldman decided to invest with Ruchkin. *Id.* at p. 97.

Because he had invested, Feldman kept an eye on the VIP night club and where money was going and how it was being spent. *Id.* at pp. 97-98. He learned that VIP was bringing in promoters from Europe but he did not find this suspicious; he simply trusted Ruchkin. *Id.* at p. 98. However, Feldman said he made it clear to Ruchkin that everything at the club had to be legal. *Id.* at p. 109. Feldman said he had very little to do with the day-to-day operations; Ruchkin, he said, was the person who handled the credit card transactions and bottle pricing. *Id.* at pp. 110-14. According to Feldman, Ruchkin also handled paying and instructing security for the club. *Id.* at pp. 118-21.

Feldman claimed that business at VIP was poor and Ruchkin was lazy and not doing his job. *Id.* at pp. 123-25. VIP shut down in less than half a year. *Id.* at pp. 131; 133. After VIP shut down, Feldman spoke with Simchuk. *Id.* at p. 134. Feldman decided to go into business with Simchuk because he knew Simchuk had run successful clubs and agreed to help him recover some of his initial investment into VIP. *Id.* at pp. 137-38; 142. Simchuk then took over the defunct VIP lounge as the manager in Ruchkin's stead. *Id.* at pp. 146-48.

With Simchuk in charge, VIP began making money. *Id.* at 149. Again, Feldman claimed to not be involved in the business and let Simchuk decide who would be hired and how the club would be run. *Id.* at pp. 153-56. After assuming management of VIP, Simchuk also offered Feldman the opportunity to become involved in Stars Lounge. *Id.* at p. 157. Feldman decided to invest in Stars Lounge with the hope that he could fully recoup his investments. *Id.* at p. 158.

Feldman claimed to have only a basic understanding of how Stars Lounge was run, including who was being paid and how much they were being paid. *Id.* at pp. 163-64. He considered himself a mere investor and trusted Simchuk to run the club. *Id.* at p. 165. Although not involved in the day-to-day operations, Feldman testified that he purchased airline tickets for a number of the female managers and promoters to build his airline miles and, in exchange, he would be reimbursed in cash. *Id.* at pp. 170-75.

As part of his investment, Feldman wanted to have control over the security of the business to make sure it was legal. *Id.* at p. 181. He wanted an actual police officer. *Id.* at pp. 180-81. Feldman met with the officer before hiring him and agreed to pay him in cash for his services. *Id.* at pp. 192-93. The officer started that evening. *Id.* at pp. 193-94. Feldman claims the specific directions given to the officer were to be provided by the club's management. *Id.* at pp. 195-96.

Feldman also introduced Simchuk to Svetlana Coghlan and suggested she become the day manager, a position Simchuk was seeking to fill. *Id.* at pp. 205-06. Coghlan's job

would be to take care of the books. *Id.* at pp. 206-07. She would accomplish this at Feldman's office. *Id.* at p. 208.

Feldman again claimed he had no understanding of how the promotors or B-girls were hired, paid, or did their job. *Id.* at pp. 217-18. To him, Simchuk was the majority business owner and responsible for the club and its decisions. *Id.* at p. 217. Based on Feldman's limited understanding of the club, a promoter would bring a customer to the club and they would order something off the menu. *Id.* at pp. 224-25. If a customer had a problem with a bill, then Feldman suggested the club accept cash and lower the amount of the bill by removing the gratuity charge. *Id.* at pp. 227-31.

Stars Lounge was open approximately 70 days. *Id.* at p. 199. During that time, Feldman stated he visited the club approximately six to eight times. *Id.* at p. 200. During those visits, Feldman claimed he was never present when any of the promotors or B-girls discussed their interactions with customers. *Id.* at p. 203. Because the club was not in his name, he was not involved in the filing of its tax returns. *Id.* at pp. 240-42. Feldman said he never checked the books to verify whether the club actually made money while it was open. *Id.* at pp. 243-44. Feldman also said he expected the officer he hired to inform him if there was anything illegal occurring at the club. *Id.* at p. 246.

ii.  <u>Sentencing</u>

Feldman's guideline range after this first trial was 70 to 87 months. [CRDE 1181, p. 37]. The trial court varied above the guidelines and sentenced Feldman to 100 months

in prison and three years' supervised release. *Id.*

The trial court included a two-level increase for obstruction of justice, stating, "I do find that, based upon my close attention that I paid throughout the eleven weeks of the trial, that Mr. Feldman perjured himself on numerous occasions, including the six specific occasions identified in the [Presentence Investigation Report]." *Id.* at p. 23. As the trial court stated further on in the sentencing,

> I have never given one minute more of a sentence because somebody went to trial. I have even varied below the guidelines after a lengthy trial involving millions of dollars in fraud. But a defendant does not have a constitutional right to perjure himself on the stand. Just like I expect our prosecutors, our agents, our attorneys and witnesses to act honestly and truthfully when they are in court, I expect the defendants to do the same, particularly since they have a constitutional right not to testify and their silence cannot be used against them.
>
> So maybe more than a lot of other judges, I look very harshly upon people who act dishonestly in court.

*Id.* at p. 35.

      b. <u>First Appeal</u>

After being convicted, Feldman and his co-defendants appealed to the Eleventh Circuit Court of Appeals. *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016). The singular issue on appeal was the trial court's decision to not include a defense-proposed jury instruction. *Id.* at 1310. The defendants asked the trial court to instruct the jury that "[f]ailure to disclose the financial arrangement between the B-girls and the Bar, in and of itself, is not sufficient to convict a defendant of any offense[.] *Id.* at 1311.

The Eleventh Circuit characterized the defendants' theory of the case as a *Casablanca* defense: they knew that the B-girls were posing as tourists to lure the men into clubs, but were "shocked, shocked" to learn that fraud was taking place inside the clubs. *Id.* at 1310. Relying on this theory of defense, the defendants wanted to ensure they were not convicted based solely on the use of B-girls to bring customers to the clubs. *Id.*

To illustrate the distinction between the intent to deceive and the intent to defraud, the Eleventh Circuit provided the following example:

> Consider the following two scenarios. In the first, a man wants to exchange a dollar into four quarters without going to the bank. He calls his neighbor on his cell phone and says that his child is very ill. His neighbor runs over, and when she arrives he asks her to make change for him. She agrees; the quarters pass to the man; the dollar passes to the woman; and they part ways. She later learns that the child was just fine all along. The second scenario is identical to the first, except that instead of giving the woman a true dollar, he gives her a counterfeit one.
>
> The first scenario is not wire fraud; the second one is.

*Id.* at 1313.

Without this instruction, the Eleventh Circuit held the jury could have convicted the defendants solely because the B-girls concealed their relationships with the club in order to entice customers to come spend money at the club. *Id.* at 1321. Along with the other defendants, Feldman admitted he was aware the B-girls concealed their relationship with the club but did not intend to defraud any customers and was unaware of any other illegal activity by the B-girls. *Id.*

Accordingly, the Eleventh Circuit reversed and remanded Feldman's two

convictions for further proceedings in the district court. *Id.* at 1325.

        c.  Second Trial

The Government's evidence in the second trial was similar to the evidence presented during the first. If anything, the evidence against Feldman *increased*; as summarized by the Government during sentencing, additional evidence was presented that Feldman would receive daily text messages with the club's profits, sought to have a device installed to block cell phone signals within the club to prevent banks from reaching out to their customers, and purchased a high-resolution camera so that he could monitor what was occurring at the clubs. [CRDE No. 1495, pp. 17-18].

        i.  Feldman's Decision to Not Testify

In this second trial, Feldman chose to not testify in his defense. The day the Government rested, the following discussions occurred between the Court, Feldman, and Houlihan:

> THE COURT: Okay. So what's the status with the defense case? If we come in - -
> MR. HOULIHAN: I do not expect Mr. Feldman to testify but I have to sit down with him. I was going to do that now . . . to make sure, since the government's rested that that is what he wishes to do.
> THE COURT: Right.
> ***
> THE COURT: Okay. So Mr. Feldman, talk to your attorneys tonight, decide whether or not you want to testify. I'm sure they'll - - I think we had this discussion last time. You have a constitutional right to testify. You also have a constitutional right to not testify. You should obviously consult with your attorneys. They're very experience in these matters, but ultimately it's your personal decision to make. Like if you want your lawyer to ask a particular question on cross-examination, they can overrule you and say,

I'm not asking that. But you - - this is one of the areas that you can overrule them, and if they don't want you to testify, you can, and if they want you to testify, you can choose to not testify. So do you understand it's your personal decision to make?

      THE DEFENDANT: Yes, Your Honor.

      THE COURT: Okay. So you don't have to decide right now. So talk to Mr. Houlihan and Mr. Cholakis this evening and we'll find out what you want to do tomorrow morning.

      MR. HOULIHAN: Judge, just not to take up your time, we have had maybe 10 to 12 conferences -- you know what it's like, and obviously we've discussed this –

      THE COURT: I don't want him to commit to it today and then say I wanted to testify, overnight I changed my mind. So we can have another discussion in the morning and whatever he wants to do is fine.

[CRDE No. 1491, pp. 202-04].

The following day, before the defense formally rested, the Court had an additional

exchange with Feldman:

      THE COURT: Okay. So Mr. Feldman, we had a little discussion about this last evening, but I want to -- your attorney just announced that you are resting your case without putting on your own testimony. Do you agree with that decision?

      THE DEFENDANT: Yes, Your Honor, I am not going to testify.

      THE COURT: All right. Is it your own personal decision to not testify as a witness in the case?

      THE DEFENDANT: Yes, Your Honor.

      THE COURT: And do you understand you have the right to overrule your attorneys and to testify if they don't want you to, but you want to?

      THE DEFENDANT: Yes, Your Honor.

      THE COURT: Has anybody forced you, threatened you, coerced you in any way, promised you anything to get you to not testify?

      THE DEFENDANT: No, Your Honor, it's my decision. Thank you, Your Honor.

[CRDE NO. 1492, pp. 33-34].

ii.  <u>Literary References</u>

During the trial, the Government made three references to the character Fagin, from Charles Dickens' novel, *Oliver Twist*. In the first and second, the Government broached the subject during jury selection:

> [GOVERNMENT]: . . . Where was my elementary teacher? Ms. [Y] back there. Do you ever remember reading *Oliver Twist*?
> PROSPECTIVE JUROR: Myself, no.
> [GOVERNMENT]: Well, did the kids read it? Do you remember the story?
> PROSPECTIVE JUROR: I know the story, yes.
> [GOVERNMENT]: Okay. Does anybody else here know *Oliver Twist*, seen the movie, read the book, about the man named Mr. Fagin who teaches all the street pickpockets how to pickpocket? Well, what do you think, Ms. [Y], do you think that Mr. Fagin is as guilty as the boy pickpockets? Because he's not there when they go pick the pockets, do you think he's as responsible as they are?
> PROSPECTIVE JUROR: I don't know.
> [GOVERNMENT]: You don't know?
> PROSPECTIVE JUROR: I don't know. I would need more than just that.
> [GOVERNMENT]: Okay. Well, if the boys go out in the street and pick somebody's pocket, he's not there, he's sitting back in the office.
> PROSPECTIVE JUROR: Okay, yes, he's responsible because as the teacher, I'm responsible for the way that my children act at school.
>
> ***
> [GOVERNMENT]: . . . Now I'm going back to you, Ms. [Y], just for a second if I may, because we're going to go back to *Oliver Twist*. If Fagin were to be charged with a crime, what would you think about some of the pickpockets who he trained and had working for him to testify about it? Do you think they could do that?
> PROSPECTIVE JUROR: Could they do that? Yes.

[CRDE No. 1486, pp. 148, 155].

The Government's final Fagin reference occurred during its rebuttal closing

argument:

> I will end with the story of where we began with my colleague[.] He talked about the story of *Oliver Twist* and how the older man, Fagan [sic], would send out his little orphans onto the street to pick people's pockets. Those guys - - Fagan [sic] wasn't there on the streets picking these pockets. Oleg Simchuk, Isaac Feldman, weren't there when these credit cards were being processed. But did they know it? Did they benefit from it? Absolutely.

[CRDE No. 1493, p. 139].

### iii.  Sentencing

Feldman's guideline range after his second trial was 46 to 57 months. [CRDE No. 1495]. Despite the lower guideline range than the one calculated in Feldman's first trial, the Court imposed the same 100-month sentence, followed by three years of supervised release, stating:

> I know I said at the first trial that I would never sentence somebody to more than one day -- or to one more day just because they went to trial, so because he went to trial a second time I am not going to give him one day more than his previous sentence, but I can't think of a reason why to give him one day less. Nothing has changed except, as the government pointed out, it appears that Mr. Feldman was a lot more involved on a day-to-day basis than we realized after the first trial because the government was, I guess, focusing on a number of different defendants and not just on him. So there was more evidence about his daily involvement, but again, I don't think that deserves a higher sentence than he previously received. I don't think he should be punished for winning his appeal and having a second trial. But I don't think he should be rewarded either. Nothing has changed in a positive way for him. I still maintain that we all have out – we all consider, all judges consider all the 18 United States Code Section 3553(a) factors. To me, I firmly believe in a right to a trial, but that does not include the right to take the stand and to lie, okay? I think we have to have a system of justice that imposes serious consequences to people who do that. And yes, he did not testify in the second case, so that's to his credit, but to me, if he had lied a second time, that would be a reason to give him more than a hundred

months.

*Id.* at 23. Earlier, when specifically addressing the obstruction of justice enhancement, the

Court had the following exchange with defense counsel:

> THE COURT: . . . What's the next objection.
> MR. HOULIHAN: The third one deals with the two-level bounce up for obstruction. I've read numerous times the sentencing transcript and how Your Honor felt particularly aggrieved by what you perceived Mr. Feldman's testimony was. I understand under that, that is obstruction.
> The second trial, as you know, I was not the first - - you know the earlier attorney. I've had lengthy - - with George, lengthy discussions with Mr. Feldman, who did not - - as you know, did not testify.
> I believe this is a judgment call on your part. You certainly could be justified, if that's the right word, in giving obstruction for the earlier conduct. However, I would ask you, in light of what you saw in the second trial, Mr. Feldman, since he did not testify, not to give the two-point upward adjustment for obstruction.
> THE COURT: All right. Well, for the same reasons I articulated at the time of the first sentencing, I think he did commit specific acts of perjury during that testimony. I think the fact that there was a second trial and he didn't testify again just means that I wouldn't give him another enhancement or a longer sentence for repeating perjury, if he did, but I don't think he should get a benefit either to erase his previous perjury, so I am going to overrule the objection and he is still going to get the enhancement for obstruction of justice.

*Id.* at 11.

> ### d.  Second Appeal

After Feldman was convicted a second time, he again appealed his convictions to

the Eleventh Circuit. *See United States v. Feldman*, 931 F.3d 1245 (11th Cir. 2019). This time,

Feldman's convictions were affirmed. *Id.* Feldman's petition for certiorari was denied by

the Supreme Court of the United States. *Feldman v. United States*, 140 S. Ct. 2658 (Mem)

(2020).

The Eleventh Circuit rejected Feldman's arguments that (1) there was insufficient evidence to support his convictions; (2) the jury instructions substantively amended the indictment; (3) the Government's Fagin references violated his right to due process; (4) the sentence was unreasonable; and (5) other errors deprived him of a fair trial. *Feldman*, 931 F.3d 1245. These claims were analyzed under different standards, depending on Feldman's attorney's action or lack of action during trial (i.e., invited error, plain error, etc.). *Id.*

### e.  Motion to Vacate Sentence

After exhausting his appellate remedies, Feldman filed the instant motion, seeking to have his conviction vacated based on ineffective assistance of counsel. After the matter was fully briefed, the Undersigned Ordered an evidentiary hearing on the following topics: "(1) Trial counsel's advice to Plaintiff about the consequences of testifying; (2) Trial counsel's decision not to object to the prosecution's literary references; and (3) Trial counsel's decisions regarding the admittance of testimony and exhibits discussing the Russian Mafia and/or Plaintiff's ties to Donald Trump." [ECF No. 11].

As noted, the evidentiary hearing lasted two and a half hours. Houlihan was the only witness presented to the Court by either party.

Houlihan testified that, before being called as a witness, he reviewed Feldman's motion and the jury instructions given by Judge Scola. [ECF No. 18, p. 7]. Before the hearing, Houlihan completed an affidavit that was prepared by the Government with his

input. *Id.* at p. 6. Houlihan reaffirmed that the contents of the affidavit were true to the best of his knowledge. *Id.* at p. 8.

Houlihan was first questioned about his advice to Feldman about whether Feldman should testify. *Id.* at p. 9. Houlihan explained that "[his] recommendation was that [Feldman] not testify at trial for a number of reasons." *Id.* at p. 10. The reasons Houlihan gave to Feldman as the basis for his recommendation included: the possibility that Feldman would receive an additional obstruction of justice enhancement; the state of the case after the Government's case in chief; Houlihan's poor opinion of Feldman's testimony from the first trial; and Houlihan's belief the testimony would not further Feldman's defense. *Id.* at pp. 12-13.

In addition to assessing Feldman's testimony from the original trial, Houlihan conducted mock cross-examinations of Feldman in his office. *Id.* at p. 16. Houlihan's co-counsel, George Cholakis, agreed with Houlihan's conclusion about whether it would be in Feldman's best interest to testify. *Id.* When questioned by the Government, Houlihan elaborated on these mock cross-examinations with Feldman. He explained that during his mock cross-examinations with Feldman, he believed Feldman's answers were often evasive or deflective "in that he would not answer specific question [sic]." *Id.* at pp. 51-52.

Houlihan understood that Feldman would have likely testified similarly to how he testified during the first trial. *Id.* at p. 23. However, in Houlihan's opinion, the AUSA

who cross-examined Feldman during the first trial "ran circles around [Feldman]" and "[Feldman] was caught in a number of different dead ends, he did not handle it very well." *Id.* at pp. 14-15.

Houlihan, when cross-examined on this subject matter, stated that he was also concerned Feldman could have received a separate obstruction of justice enhancement if he were to testify during the second trial. *Id.* at p. 53. Significantly, Houlihan unequivocally explained that he never told Feldman that the trial court would not enhance him for obstruction of justice if he did not testify. *Id.* at p. 54.

Houlihan's testimony next turned to his decision to elicit testimony regarding the Russian Mafia. *Id.* at p. 24. Although the topic was excluded during the first trial, Houlihan decided not to pursue exclusion of the references during the second trial and, instead, affirmatively brought up the subject during questioning. *Id.* at p. 25.

Houlihan provided the basis for this particular trial strategy: "[I wanted] to portray Mr. Feldman as a little guppy swimming with sharks. In way over his head, he's a businessman, this is not his field, this is not people he deals with. These are dangerous people who use people for their own purposes and cast them off." *Id.* at pp. 25-26. On cross, Houlihan elaborated that he wanted to create a contrast between Simchuk and Feldman. *Id.* at p. 59. Although Houlihan understood the danger behind bringing the evidence out during trial, he believed it dangerous only "[i]f they could link [Feldman] to a Russian mafia" but, in his opinion, "there was no linkage anywhere in the trial that

[he was] aware of." *Id.* at p. 26.

Houlihan then discussed many of the Russian Mafia/violence questions he posed to multiple different witnesses. In all situations, Houlihan was discussing the Russian Mafia in direct relation to Simchuk or as a general principle, with Simchuk's tactics as the backdrop. *Id.* at pp. 26-39. Houlihan never elicited a connection between *Feldman* and the Russian Mafia.

Houlihan then discussed his decision to allow the jury to view a flyer containing a compilation of photos depicting Feldman with Donald Trump, Ed Koch, Leslie Nielson, and various Russian actors or singers.[6] Houlihan highlighted the flyer and said to the jury during his opening statement, "[m]uch like our current president, [Feldman] brings in his son, his son-in-law, and his daughter. *Id.* at p. 47. Houlihan decided to do this because he wanted to depict Feldman as a businessperson who did everything he could to market himself. *Id.*

Although Houlihan accepted responsibility for using the flyer, he discussed the decision with Feldman beforehand. *Id.* at p. 62. Feldman supported the decision. *Id.* Houlihan reiterated that he believed the flyer depicted Feldman as a businessman. *Id.*

## II.   Legal Standard

---

[6]      This was technically a Government exhibit introduced into evidence. The flyer in question was part of a composite exhibit collected during a search of Feldman's real estate business. Before the trial, the Government sought to remove this singular page from the composite exhibit; however, Houlihan affirmatively wanted the flyer in evidence.

In order to prevail on an ineffective assistance of counsel claim, the movant bears the burden of establishing: (1) his counsel's performance was deficient by falling below an objective standard of reasonableness; and (2) prejudice -- but for the deficiency in representation, there is a reasonable probability that the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984); *Chandler v. United States*, 218 F.3d 1305 (11th Cir. 2000) (*en banc*). "Establishing these two elements is not easy: 'the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.'" *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002) (quoting *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (*en banc*)).

In assessing the performance prong, the Eleventh Circuit presumes counsel's performance was acceptable, and it looks not for "what is prudent or appropriate, but only what is constitutionally compelled." *Hardwick v. Crosby*, 320 F.3d 1127, 1161 (11th Cir. 2003); *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*) ("Courts must indulge the strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment."); *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992) ("Courts should at the start presume effectiveness and should always avoid second-guessing with the benefit of hindsight.").

"[The Court's] role in reviewing an ineffective assistance claim is not to 'grade' a

lawyer's performance; instead, [the Court] determine[s] only whether a lawyer's performance was within 'the wide range of professionally competent assistance.'" *Van Poyck,* 290 F.3d at 1322 (citing *Strickland,* 104 S.Ct. at 2066). A movant must establish that "**no** objectively competent lawyer would have taken the action that his lawyer did take." *Id.* (emphasis added).

In order to establish prejudice, the movant must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687. This is not an outcome determinative analysis:

> an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

*Lockhart v. Fretwell,* 506 U.S. 364, 369 (1993).

In other words, a movant cannot prevail on the prejudice prong based on the mere fact he received an unfavorable verdict. Rather, the prejudice component "focuses on the question [of] whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Id.* at 372.

A petitioner's conclusory statements, unsupported by specific facts or by the record, are insufficient to state a claim for ineffective assistance of counsel in a collateral proceeding. *Tejada v. Dugger,* 941 F.2d 1551, 1559 (11th Cir. 1991). "The burden of persuasion is on a petitioner to prove, by a preponderance of competent evidence, that

counsel's performance was unreasonable." *Chandler*, 218 F.3d at 1313.

### III.    Analysis

As explained below, the Undersigned finds Feldman's arguments unpersuasive.

### a.    Houlihan was not Ineffective Based on the Advice He Provided to Feldman About Whether Feldman Should Testify

Feldman claims his trial counsel was ineffective in failing to properly advise him on whether he should testify in his defense. [ECF No. 1].[7] Specifically, he claims his trial counsel misadvised him that if he did not testify, then he would not receive an obstruction of justice enhancement at sentencing. *Id.* He also claimed that his counsel was ineffective for failing to realize and/or failing to inform him that his testimony was necessary to provide a factual basis for his defense to the charges, which was that his involvement with the nightclubs did not extend to the fraudulent activity. *Id.*

Houlihan contests the first allegation, and states in both his affidavit and during his testimony at the evidentiary hearing that he never told Feldman he would not receive an obstruction of justice enhancement if he did not testify. [ECF Nos. 7-1; 18, p. 54]. In response to Feldman's second allegation, Houlihan felt, as a matter of trial strategy (based

---

[7]    The only evidence available to the Undersigned establishing Feldman's version of the advice his attorney provided is the initial sworn motion. [ECF No. 1]. Neither of Feldman's subsequent pleadings [ECF Nos. 6; 8] contain an affidavit signed by Feldman or are otherwise adopted by Feldman. Nor did Feldman testify during the hearing.

Thus, to the extent Feldman relies on allegations not explicitly contained in his original sworn motion or are otherwise verifiable in the evidentiary record, the Undersigned will not include them in the analysis.

both on the evidence as it unfolded during the Government's case and on his concerns about Feldman's believability as a witness), it would be best for Feldman to not testify. [ECF No. 18, pp. 12-16].

"It is clear that a criminal defendant has a constitutional right to testify in his own behalf at his trial." *United States v. Teague*, 953 F.2d 1525, 1529 (11th Cir. 1992). Despite the fact that the right belongs to the criminal defendant, there are strategic implications in exercising the right and defense counsel "bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide." *Id.* at 1533. Implicit in these responsibilities is the requirement that defense counsel give *correct* legal advice. *United States v. Poe*, 352 F.2d 639 (D.C.C. 1965) (affirming trial court's finding that petitioner was denied a fair trial because evidence showed he would have testified had he not received advice that was an incorrect statement of the law).

Feldman's first allegation of misadvice presents a factual dispute. Feldman claims "[c]ounsel misadvised me that if I did not testify[,] I would not receive an obstruction of justice enhancement at sentencing (and that was not true)." [ECF No. 1]. Houlihan disputes this claim and states that he told Feldman that if he testified and was convicted, the court could add a *second* obstruction of justice enhancement if it believed Feldman perjured himself a second time. [ECF Nos. 6-1; 18, p. 54]. The Undersigned rejects Feldman's version of events and finds Houlihan's testimony on the issue credible.

At the outset, Feldman has an obvious motive to fabricate the advice given to him by his trial counsel. Moreover, he did not testify about the conversation at the hearing (perhaps due to the same fears Houlihan had in considering whether it would be wise for him to testify during trial), so the Undersigned is left with only a single sentence (from Feldman's written declaration) as evidence meant to meet Feldman's burden.

In contrast, Houlihan testified at the hearing, explicitly rebutted Feldman's claim, and provided the context, nature, and reasoning behind the obstruction of justice related advice he provided to Feldman. Houlihan's testimony is bolstered by his objections to the Presentence Investigation Report and his arguments during the sentencing hearing. [CRDE Nos. 1468; 1495, pp. 11-12]. In these pre-habeas arguments, Houlihan did not claim that the trial court is *prohibited* from applying an obstruction of justice enhancement; rather, he argues that the enhancement is not warranted, and the trial court should consider the fact Feldman did not testify a second time and exercise its discretion in choosing not to. [CRDE Nos. 1468; 1495, p. 11-12]. This logic is consistent with the advice Houlihan states he gave to Feldman. This advice is also not incorrect or ineffective.

The next allegation of ineffectiveness levied by Feldman is appropriately summarized as a claim that trial counsel failed to inform Feldman and or realize that Feldman's testimony was necessary to defend against the charges. [ECF No. 1]. Houlihan claims this was part of his strategy. Houlihan said that he briefly discussed with Feldman the benefits of him testifying, but he focused primarily on the downsides because it was

his strong feeling that Feldman should not testify. [ECF No. 18, p. 56]. Thus, Houlihan

explained that he understood the benefits of Feldman testifying, but he believed them to

be heavily outweighed by the potential negative consequences.

Houlihan's advice to Feldman falls within the bounds of reasonable strategy. *See*

*Teague*, 953 F.2d at 1533 ("[I]f counsel believes that it would be unwise for the defendant

to testify, counsel may, and indeed should, advise the client in the strongest possible

terms not to testify.").

Here, Houlihan considered the following possible reasons for Feldman to not

testify: (1) they had gotten the best possible factual presentation from the Government's

case [ECF No. 18, p. 12]; (2) Feldman testified poorly during the first trial [ECF No. 18, p.

13]; (3) Feldman performed poorly during mock cross-examinations conducted as part of

trial preparation [ECF No. 18, p. 16]; and (4) Feldman ran the risk of receiving a greater

sentence if he were to testify and be convicted [ECF No. 18, p. 54]. Houlihan felt the best

course of action during the trial was to attack the Government's witnesses on cross-

examination and contrast their unscrupulous character with Feldman's good character.

The strategy behind Houlihan's advice is not one which "no objectively competent

lawyer would have taken." *Van Poyck*, 290 F.3d at 1322. Indeed, there may be a number

of reasons why an attorney could advise their client not to testify. *Poe*, 352 F.2d 641

(stating that a bad record or a weakness in the defendant's personality are valid reasons);

*Teague*, 953 F.2d at 1533, n.1 (some examples of a reason why it may not be best for a

defendant to testify might be "if the defendant might provide evidence of missing elements of the crime on cross-examination, if the defendant might be prejudiced by revelation of prior convictions, or if the prosecutor might impeach the defendant using a prior inconsistent statement").

Indeed, the mere fact that a defendant testifies raises significant legal risks. *See United States v. Sharif*, 893 F.2d 1212, 1214 (11th Cir. 1990) ("When the defendant elects to testify, he runs the risk that if disbelieved, the trier of fact may conclude that the opposite of his testimony is the truth.").

"When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." *Chandler*, 218 F.3d at 1316. In this Circuit, the "strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel." *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998). "[T]he more experienced an attorney is, the more likely it is that his decision to rely on his own experience and judgment . . . was reasonable under the circumstances." *Spaziano v. Singletary*, 36 F.3d 1028, 1040 (11th Cir. 1994).

Houlihan is a criminal defense attorney with more than four decades of experience. [ECF No. 7-1]. During that time, he has tried more than 100 criminal jury trials to verdict. *Id.* Here, Houlihan was able to base his advice on perhaps the most valuable piece of evidence an individual could have when determining whether it is wise to

recommend his client take the stand -- prior testimony from an earlier trial. Houlihan did not have to guess or speculate about how Feldman would perform on cross-examination; he read it, evaluated it, and, based on his 40+ years of experience, determined Feldman performed poorly.

Feldman has not presented any evidence that he was prohibited from testifying or otherwise led to believe he could not testify. *Teague*, 953 F.2d at 1534 (affirming that counsel was not ineffective based on district court's findings of fact that "the evidence fail[ed] to show that the Defendant's will was 'overborne' by his counsel. The Defendant was advised of his right to testify, was advised that he should not exercise that right, and did not protest"). Importantly, here, Feldman's claims are undermined by the colloquy conducted by the court where Feldman gave the following answers:

> THE COURT: All right. Is it your own personal decision to not testify as a witness in the case?
> THE DEFENDANT: Yes, Your Honor.
> THE COURT: And do you understand you have the right to overrule your attorneys and to testify if they don't want you to, but you want to?
> THE DEFENDANT: Yes, Your Honor.
> THE COURT: Has anybody forced you, threatened you, coerced you in any way, promised you anything to get you to not testify?
> THE DEFENDANT: No, Your Honor, it's my decision. Thank you, Your Honor.

[CRDE NO. 1492, pp. 33-34]; *See Paul v. United States*, 627 F. App'x 806, 808-09 (11th Cir. 2015) (finding defense counsel was not ineffective regarding defendant's right to testify where district court informed defendant of his right to testify and where defendant had already testified in his first trial and witnessed the strategic

implications of his decision to testify).

Thus, the Undersigned finds that Feldman has not met his burden to prove by a preponderance of competent evidence that his trial counsel provided deficient performance when advising Feldman on whether he should testify. Because the Undersigned has determined Houlihan was not ineffective, I am permitted to not address the prejudice prong of *Strickland. See Stepp v. Jones*, No. 16-CV-25170, 2018 WL 9439862, at *8 (S.D. Fla. Mar. 16, 2018) ("A court thus need not address both components of the [*Strickland*] inquiry if the defendant makes an insufficient showing on one."). Nonetheless, I will briefly address the prejudice prong.

Feldman argues that prejudice does not require showing a reasonable probability of a different outcome to the case, but only a showing "that the outcome [i.e., the waiver of constitutional rights] would have been different . . . ." [ECF No. 6] (alterations in original). In support of this unique view of the prejudice prong, Feldman cites *Brownlee v. Haley*, 306 F.3d 1043, 1059-60 (11th Cir. 2002). Feldman's bracketed language misconstrues *Brownlee's* holding, as well as the well-settled case law that the *result of the proceeding* is the relevant inquiry. The language surrounding Feldman's quote makes it clear that the Court was distinguishing the burden of persuasion, not the area of inquiry:

> [T]he petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, *the result of the proceeding would have been different*. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Although this standard is difficult to meet, it is significant that a petitioner must show only a reasonable probability that the outcome would have been different; he need not show that counsel's

deficient conduct more likely than not altered the outcome in the case.

*Brownlee*, 306 F.3d at 1059-60 (internal quotations omitted) (internal citations omitted) (emphasis added).

Feldman's attempts to establish prejudice falter for myriad reasons. At bottom, there is no evidence that anything in the trial would have been different had Houlihan given different advice. As discussed earlier, the only evidence in front of the Undersigned regarding Feldman's view of the decisions and allegations of misadvice are those within his initial signed motion.

Feldman never states that he would have testified if Houlihan had given him different advice or advice he now believes would have been correct or sufficient. [ECF No. 1]. Instead, this assertion is *argued* by his attorney in the memorandum of law. [ECF No. 6]. This is insufficient to establish a fact. *Lehrfield v. Liberty Mut. Fire Ins. Co.*, 396 F. Supp. 3d 1178, 1183 (S.D. Fla. 2019) ("First of all, attorney argument is not evidence."); *Bryant v. U.S. Steel Corp.*, 428 F. App'x 895, 897 (11th Cir. 2011) ("True, her attorney argues that her recollection had been refreshed, but counsel's argument is not evidence," and affirming summary judgment for defendant); *Latele Tele., C.A. v. Telemundo Commc'ns Grp., LLC*, No. 12-22539-CIV, 2014 WL 7272974, *7 (S.D. Fla. Dec. 18, 2014) ("Rhetoric and attorney argument are no substitute for record evidence.").

However, even if there were record evidence that Feldman would have testified (and there is none), he still has not met his burden to establish prejudice based on the

30

advice. As Feldman's first claim of prejudice, he implicitly argues that he was still enhanced and thus did not receive a lower sentence for not testifying. The trial court's sentencing comments undermine this contention.

First, the trial court imposed the same sentence it had imposed after the first trial. This occurred despite the fact that Feldman's guidelines decreased from 70-87 months to 46-57 months. Thus, it seems that even if the Court had not imposed the two-point enhancement for obstruction of justice, it would have imposed the same sentence. The trial court also indicated that had Feldman testified again, it likely would have imposed a second obstruction of justice enhancement and Feldman's decision to not testify meant only that "[the trial court] wouldn't give him . . . a longer sentence for repeating perjury." Thus, it appears Houlihan's advice had the intended effect: diminishing the chance of Feldman receiving a lengthier sentence if he were to testify and if the Court were to find he perjured himself a second time.

Second, Feldman has not shown a reasonable probability that the jury would have acquitted him had he testified. Although the Eleventh Circuit reversed his first conviction based on the failure to give a jury instruction, this fact does not by itself establish a reasonable probability that the jury's verdict would have been different in the second trial. In the appeal, the Government had to prove harmless error, *Takhalov*, 827 F.3d 1307; here, Feldman must prove reasonable probability.

Feldman argues that only his testimony could provide the defense to intent.

However, as Feldman concedes, "[t]he prosecution's evidence at trial was arguably strong" and the "witnesses presented damning evidence against Feldman." [ECF No. 8].

At trial, the Government presented, among other things, direct evidence of Feldman's knowledge through cooperating witnesses and undercover law enforcement, audio/video recordings of Feldman making incriminating statements, financial records showing investments in the club and payments for plane tickets for B-girls, and financial records showing chargebacks and fraud being held in his real estate office and maintained by a family member. This is powerful evidence, and Feldman has not presented a convincing argument that the jury's verdict would have been different had he testified. *Topete v. United States*, 628 F. App'x 1028, 1030 (11th Cir. 2015) (finding no prejudice when "[i]t [was] not reasonably probable that [the defendant's] testimony, nor the remainder of his proposed testimony, would have caused the jury to render a different verdict").

Feldman has not met his burden to establish a reasonable probability that failure to present his testimony "renders the result of the trial unreliable." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). He has done nothing to counter the significant fact that the trial court, which had the opportunity to listen to the witnesses and consider the evidence, found that Feldman had perjured himself. Nor has Feldman countered the fact that this factual finding was upheld on appeal. *See Feldman* 931 F.3d at 1262-63.

Therefore, Feldman has failed to establish either deficient performance or

prejudice resulting from any alleged deficient performance.

### b. There Was No Error in the Jury Instruction, and Houlihan Was Not Ineffective by Not Objecting

Feldman next claims his attorney was ineffective for failing to object to the following jury instruction:

> The law does not excuse a patron from his obligation to pay for beverages or goods just because he became intoxicated voluntarily. Even if the establishment uses attractive women to encourage a patron to purchase and consume increasing amounts of alcoholic beverages, the patron is not a victim of fraud when he becomes intoxicated voluntarily and later regrets the purchase. *But it the establishment forces the patron to consume the alcoholic beverage, or adulterates the beverage, or allows or encourages the patron to become intoxicated with the intent to charge his credit card for purchases he is either unaware of or too intoxicated to consent to purchase, then such conduct may constitute fraud.*

[CRDE No. 1492, pp. 75-76] (emphasis added to complained of portion of the instruction). This, Feldman argues, constructively amended the indictment and allowed the jury to convict for something that is "not a federal crime." [ECF No. 8].

Feldman's arguments are without merit. The superseding indictment offers myriad grounds on which the jury could find Feldman participated in a conspiracy to commit wire fraud. By way of example, the indictment detailed the following "manner[s] and means:"

> 20. Once a victim credit card holder had been identified at legitimate bars in Miami Beach, B-girls approached the target, engaged him in flirtatious banter, and plied him with alcohol . . . . At times, bartenders or managers would instruct the B-girls to intoxicate the victim credit card holder further before bringing them to the Simchuk Clubs.

33

\*\*\*

22. At the Simchuk Clubs, the B-girls would order alcohol, including bottles of wine or champagne without the victim credit card holder's knowledge or would entice the victim credit card holder to order the alcohol for them . . . . The victim credit card holders were either not told the price of the alcohol, told an incorrect price, or were purposely distracted when they attempted to inquire about the price of the alcohol.

23. The B-girls continued to order additional bottles of wine and champagne, surreptitiously pouring out drinks and bottles into plants, ice buckets, or other receptacles so that more alcohol could be brought. Frequently, additional bottles were brought that were not ordered or authorized by the victim credit card holders.

24. The B-girls and bartenders attempted to further intoxicate the victim credit card holders by encouraging them to drink alcohol. If a victim credit card holder was not sufficiently intoxicated, B-girls would order shots of alcohol, including vodka to further impair the victim credit card holder's judgment and awareness of the fraud. The B-girl bartenders frequently gave B-girls only water disguised as alcohol in order to better perpetrate the fraud on the victim credit card holders.

[CRDE No. 1444].

Jury instructions constructively amend an indictment when "the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." *United States v. Keller*, 916 F.2d 628, 634 (11th Cir. 1990). By way of example, in *United States v. Madden*, 733 F.3d 1314 (11th Cir. 2013), the Eleventh Circuit found the District Court's jury instructions constructively amended the indictment when the instructions allowed the jury to find the defendant guilty for "carry[ing] a firearm during and in relation to a drug trafficking offense[]" and the "indictment only charged Madden with possessing a firearm 'in

furtherance of . . . a drug trafficking crime' and using and carrying a firearm 'during and in relation to a crime of violence.'" The Court held that "during and in relation to" was broader than "in furtherance of." *Id.* at 1318.

No such amendment occurred here. Feldman complains that "[t]he grand jury did not indict [him] on the theory that selling alcohol to drunk patrons[] or helping guide a patron to sign for ordered drinks constitutes fraud" and this amendment allowed the jury to convict on those theories. [ECF No. 6]. At the outset, nothing in *this* jury instruction mentions guiding patrons into signing for drinks.[8] The other complained-of portion is clearly encompassed within the indictment excerpts cited above.

Feldman also argues that this instruction allowed the jury to convict him for something that is not a federal crime. [ECF No. 8]. Using Feldman's example of non-criminal behavior, the Undersigned will mirror the way the Eleventh Circuit distinguished deceit from fraud. If a patron is drinking with a friend and running a bar tab, then the patron may be unaware of drinks ordered by the friend, yet it would hardly be fraud for the bar to charge the patron's credit card for those friend-served drinks

---

[8]    The Eleventh Circuit also rejected this argument, finding this would, at most, constitute a variance, not an amendment. *Feldman*, 931 F.3d at 1260-61 ("To the limited extent that minor discrepancies may exist between the allegations of the indictment and the corresponding parts of the government's evidence at trial—for instance, one could cavil whether the indictment's allegation that B-girls forged customers' signatures contains the slightly distinct charge, of which evidence was presented at trial, that B-girls sometimes helped guide an intoxicated patron's hand when he was signing a receipt—such details would be grist for a variance argument, not a constructive-amendment argument.").

because it allowed the patron to become intoxicated. However, if the bar facilitates the patron's intoxication with the intent of allowing another individual to purchase drinks for which the patron is unaware of or did not consent to and then charging the patron's credit card, then it is fraud.

The first example is not wire fraud; the second one is. Likewise, the first example is not grounds to convict on this jury instruction; the second one is. The jury instructions make clear that the intent behind the intoxication or the bar employee's actions is a key factor. Thus, the jury instructions did not broaden the scope to allow the jury to convict on otherwise legal conduct.

Accordingly, there can be no prejudice and Feldman's ineffective assistance of counsel claim fails on this ground.

### c. There Was No Prejudice Caused by the Government's "Fagin" References

Feldman's next allegation revolves around his counsel's failure to object to the Government's references to Fagin, a villain from Charles Dickens' novel, *Oliver Twist*. In his argument for ineffective assistance of counsel, Feldman places great weight on literature discussing the anti-Semitic portrait created by Dickens' description of Fagin. [ECF No. 6]. He notes that publications have referred to Fagin as "one of the most grotesque Jews in English literature" or as drawn associations of the Jew "with the Devil and beasts." Certainly, trading on this type of anti-Semitic caricature for a conviction has no place in the justice system.

However, that has not happened here. As the Eleventh Circuit stated, "a prosecutor's exploitation of racial or ethnic animus can deprive a defendant of a fair trial . . . but nothing of the kind happened to Feldman." *Feldman*, 931 F.3d at 1261. The Government mentioned Fagin on three occasions during a nine-day trial. The Eleventh Circuit referred to the references as "brief" and "anodyne." *Id.*

"The government never referred to Fagin's or Feldman's ethnicity, and it is clear from the record that it neither intended to trade nor inadvertently traded on an ethnic stereotype in order to prejudice Feldman." *Id.* In fact, the jury did not appear to even know who Fagin is. Without the background provided by Feldman in his motion, it would be impossible for the jury to associate Feldman with this character, despite Feldman's claim that Fagin's status as a foreign Jew "may subconsciously hit home with jurors, as Feldman himself is a Russian Jew who speaks with a heavy accent." [ECF No. 6].

Although the Eleventh Circuit evaluated Feldman's claim under a plain error standard, the Undersigned agrees with the conclusion and finds there is no reasonable probability that Feldman was denied a fair trial, or that the integrity of the verdict was undermined by the Government's fleeting references made to jurors who were wholly unfamiliar with Fagin's background and the scholarly research into what Fagin represents.

> ### d. Houlihan's Decision to Introduce Evidence of the Russian Mafia and Make Use of the Photo of Feldman and President Trump Was Sound

### Strategy

Feldman's final habeas claim alleges his trial counsel was ineffective by permitting the jury to associate him with Donald Trump and the Russian Mafia, which Feldman claims "inevitably linked [him] to the belief by a plurality of the country that Mr. Trump colluded with the Russians and obstructed justice in his own investigation." [ECF No. 6]. Houlihan argues he did this as part of his strategy, which was to portray Feldman as a businessman and then contrast that image with the background of the Government's main witness, an admitted member of the Russian Mafia.

In order to prevail on this claim, Feldman "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. Feldman has not met this burden. Not only is Feldman's failure to rebut the presumption afforded to his trial counsel's actions fatal to his claim, the actual explanation provided by Houlihan creates an insurmountable hurdle. While Houlihan's strategy might not be one which every lawyer would agree with, it is certainly not one with which every lawyer would disagree. *Van Poyck*, 290 F.3d at 1322 (a movant must establish that "no objectively competent lawyer would have taken the action that his lawyer did take").

One of the main witnesses against Feldman was Simchuk, a cooperating witness for the Government. Houlihan's chosen strategy was to highlight Simchuk's extensive criminal past, his violence towards the B-girls, his command over the operation, and his

threatening behavior. [ECF No. 18, pp. 58-60]. He then wanted the jury to hear about Simchuk's 36-month sentence. *Id.* Armed with this evidence, Houlihan's strategy was to then contrast Feldman's characteristics and use character evidence to paint Feldman as a naïve, gullible, businessman.[9] *Id.*

While the strategy ultimately proved ineffective, that does not mean that it was not sound or within the wide range of objectively competent conduct. To be sure, there was an overwhelming amount of evidence against Feldman. Very few, if any, strategies likely would have been effective in the face of the Government's case. The consideration is not whether the strategy was ineffective, it is whether the strategy was constitutionally deficient.

Feldman has failed to meet his burden to show that Houlihan's decisions fell outside the bounds of reasonably professional judgment.

## IV.    Conclusion

For the reasons discussed above, the Undersigned **respectfully recommends** that the District Court **deny** Feldman's habeas motion.

## V.    Objections

The parties will have 14 days from the date of this Report and Recommendations within which to file written objections, if any, with the District Judge. Each party may file

---

[9]    The decision to use the Trump photograph was apparently supported by Feldman, which further undermines his claim. [ECF No. 18, p. 62].

a response to the other party's objection within 14 days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in the Report except upon grounds of plain error if necessary in the interests of justice. *See* 29 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

   **RESPECTFULLY RECOMMENDED** in Chambers, at Miami, Florida, December 7, 2021.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Robert N. Scola
Counsel of Record